714 P.2d 93
**STATE of Idaho, Plaintiff-Respondent,**

**v.**

**Keith Max ROSENCRANTZ,
Defendant-Appellant.**

**No. 15721.**

Court of Appeals of Idaho.

Feb. 3, 1986.

BURNETT, Judge.

This case presents a tragic story of jealousy, alcohol and violence. Two people are dead. Cathy Alice Gittel and Michael Wayne Lee died from shotgun blasts fired in Cathy's home. A neighbor found Cathy's former boyfriend, Keith Rosencrantz, lying in the doorway of the house, bleeding from a gunshot wound to his shoulder. "Help me," said Rosencrantz. "I have killed them all."

Following an investigation, the police concluded that Rosencrantz indeed had killed Cathy and Michael, then had turned the shotgun on himself. Unlike his victims, Rosencrantz survived. The county prosecutor charged him with two counts of first degree murder. A jury, after hearing evidence of alcohol consumption and other events before the shooting, found Rosencrantz guilty of voluntary manslaughter. The district judge imposed two fixed sentences of ten years, to be served consecutively. On appeal Rosencrantz has challenged the correctness of evidentiary rulings during the trial, the propriety of remarks by the prosecutor, and the length of the sentences. For reasons set forth below, we affirm.

I

We first consider the evidentiary issues. Rosencrantz contends that the trial court erred by admitting evidence that Cathy was afraid of him, that he had been observed carrying a firearm while intoxicated, and that he admitted having shot himself. We also must decide whether testimony about a sodium amytal ("truth serum") interview was correctly excluded from evidence and whether a written report by an expert witness was properly admitted.

A

Cathy's sister, Cindy Graffee, testified that Cathy and Rosencrantz had lived together briefly. When the relationship deteriorated, Cathy moved in with her sister. The sister stated that Rosencrantz came to her house one evening before the shoot-

Jeff Stoker, Twin Falls, for defendant-appellant.

Jim Jones, Atty. Gen. by Lynn E. Thomas, Sol. Gen., and Myrna A.I. Stahman (argued), Deputy Atty. Gen., Boise, for plaintiff-respondent.

ings, asked whether Cathy was seeing another man, and struck Cathy repeatedly in the face. The sister also testified that Cathy acted fearful of Rosencrantz—looking nervously at the street if a vehicle approached the house, placing a blanket over curtains on the front window, locking the door, avoiding people, and parking her car "in different places so it would not be so obvious." Based on these observations, the sister said that Cathy was "afraid" of Rosencrantz and "strongly preferred not to be around him."

Defense counsel objected to testimony showing Cathy's fear of Rosencrantz, characterizing it as hearsay. He also contended that the testimony contained lay opinion and that, in any event, it should have been excluded because the sister destroyed some notes she had made before trial.[1] We will examine these points in turn.

1

Hearsay may consist of verbal or nonverbal expression. At common law, expressive conduct was treated as hearsay and therefore was inadmissible to prove the truth of matters impliedly asserted unless they came within a recognized exception to the hearsay rule. *See generally* REPORT OF THE IDAHO STATE BAR EVIDENCE COMMITTEE at C801, p. 1 (December 16, 1983). In contrast, the Idaho Rules of Evidence now exclude nonverbal conduct from the definition of "hearsay" unless it was "intended" by the actor to be an assertion. I.R.E. 801(a). However, the instant case was tried before the Idaho Rules of Evidence were adopted. Accordingly, we will apply the common law as developed in Idaho and will presume, for the sake of discussion, that Cathy's conduct was a form of nonverbal expression.

The principal Idaho cases dealing with out-of-court declarations by crime victims are *State v. Radabaugh*, 93 Idaho 727, 471 P.2d 582 (1970), and *State v. Goodrich*, 97 Idaho 472, 546 P.2d 1180 (1976). *Radabaugh* focused upon two categories of statements by a victim-declarant: a statement made to an eventual witness and a statement made to the defendant. The first category concerns us here. The Supreme Court held that a statement made to an eventual witness, expressing fear of the defendant and giving a reason for such fear, is nonhearsay and therefore is admissible if offered merely to show the declarant's fearful state of mind, not to establish the truth of the reason given. The Court noted with approval that the jury had been instructed on this limited purpose.

*Goodrich* similarly involved out-of-court declarations made by a victim to an eventual witness. The victim expressed apprehension about the defendant, referring to several hostile acts. The trial court admitted testimony concerning these statements but gave no instruction informing the jury that the evidence could be considered only to show the declarant's state of mind, not the occurrence of hostile acts. The Supreme Court reversed and remanded for a new trial, directing that such an instruction be given.

Unfortunately, the Court in *Goodrich* offered a roundabout explanation of why a limiting instruction was necessary. Rather than simply saying that the instruction would confine the use of an out-of-court declaration to a valid, nonhearsay purpose, the Court said the instruction was required to prevent unfair prejudice from exceeding the testimony's probative value. The Court thus finessed the conceptual problem of identifying and excluding hearsay by redefining it as a mere task of alleviating prejudice. Notably, the present Rules of

---

1. The sister's testimony has not been challenged on the separate ground of relevancy. Cathy's fearful state of mind was germane to the prosecutor's theory that she did not confront or provoke Rosencrantz when he entered the sister's house; instead, she tried to run from him. The apparent lack of confrontation or provocation was important to the prosecutor's effort to ob- tain convictions for first degree murder. Because the jury ultimately returned a verdict of voluntary manslaughter, the state now suggests that error, if any, in admitting the sister's testimony was harmless. We need not pass upon this suggestion in light of our conclusion that the testimony was, in any event, correctly admitted.

Evidence have eschewed this approach. The Rules now treat testimony regarding a victim's expression of fear as hearsay but they grant it limited admissibility under an exception for "existing mental, emotional, or physical condition" so long as it is not offered "to prove the fact remembered or believed" by the declarant. I.R.E. 803(3).

■ Despite their differing approaches, *Radabaugh* and *Goodrich* share a common thread that also can be discerned in the Rules of Evidence. A victim's out-of-court expression of fear may be used to show his or her state of mind but not to prove the underlying facts upon which the fear is based. Those underlying facts must be established by other, nonhearsay evidence.

■ With this understanding, we return to the instant case. As noted, Cathy's sister testified about conduct by which Cathy evinced her fear of Rosencrantz. Such testimony plainly was admissible under *Radabaugh* and *Goodrich*. Cathy's conduct revealed her state of mind without portraying the facts upon which the fear was based. Those facts were independently established by the sister's testimony that she saw Rosencrantz beat Cathy. The state also produced other nonhearsay evidence showing that on a separate occasion, Rosencrantz had come to the sister's house and had threatened to "blow down the door" if Cathy did not open it. Consequently, the instant case satisfies the requirements of *Radabaugh* and *Goodrich*. The district judge committed no error by admitting the sister's testimony over a hearsay objection or by failing to give the jury a limiting instruction.[2]

### 2

We next consider Rosencrantz's challenge to the sister's testimony as lay opinion. Presumably, this challenge is directed toward statements such as those mentioned above—that Cathy was "afraid" of Rosencrantz and that she "strongly preferred not being around him." We find no error in admitting the testimony.

■ A trial court may allow a lay witness to state an impression or conclusion about a matter of fact within his knowledge. *E.g., Howard v. Missman,* 81 Idaho 82, 337 P.2d 592 (1959); *accord* I.R.E. 701. The admissibility of such testimony turns upon its underlying factual basis, not upon its opinion format. *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982). Here, the factual basis of the testimony is manifest.

### 3

Rosencrantz's final attack upon the sister's testimony is based upon her destruction of notes. At a pretrial hearing the sister informed counsel for both sides that she "did write things down" after the shooting in order to aid her memory. When asked for the written material, the sister produced some documents but said that many notes pertinent to this case apparently had been discarded. She explained that while feeling depressed one day, she had "[thrown] a lot of things away that concerned Cathy. What all I threw away, I do not know."

At trial, defense counsel moved to bar all testimony by the sister, asserting that her memory without the notes was unreliable and that the notes might have contained exculpatory information. After listening to the sister testify on voir dire regarding the notes and her recollection of events, the district judge ruled:

> It is clear from the voir dire of this witness that her testimony ... would be from her independent recollection of events which she witnessed or was a part of and not from review of any notes,

**2.** For the first time on appeal, Rosencrantz also contends that the sister's testimony about Cathy's conduct violated his sixth amendment right to confront an adverse witness. This issue is closely related to, but not necessarily coextensive with, the hearsay question. *State v. Goodrich, supra* (Bakes, J., concurring specially).

Except in a case of fundamental error, we will not address issues tardily raised in a criminal appeal. *E.g., State v. Wright,* 97 Idaho 229, 542 P.2d 63 (1975). In this case, it is sufficient to say that we find no genuine abridgement of the sixth amendment and, therefore, no fundamental error.

either notes that have been turned over or notes that may have been destroyed. And her testimony certainly would be proper.

There being no evidence that there was anything in those notes which would have or may have been favorable to the Defendant, while there is always that risk, without some evidence this court cannot exclude or bar the testimony....

■ We agree. The mere fact that a witness has made notes does not mean that her testimony is inadmissible without them. The fundamental test is whether the testimony is based on first-hand knowledge of the facts. E. CLEARY, McCORMICK ON EVIDENCE § 300, p. 865 (3d ed. 1984). Here, the record supports the district judge's determination that the sister had independent recall of the pertinent events. Conversely, the record contains no indication that the notes were exculpatory or that their destruction was due to any misconduct by, or imputed to, the state. Absent such a showing, the sister's testimony was properly admitted. *See, e.g., State v. Murinko,* 108 Idaho 872, 702 P.2d 910 (Ct. App.1985).

## B

The next evidentiary issue relates to testimony by a police officer. After Rosencrantz threatened to "blow down the door" unless Cathy opened it, a city patrolman stopped Rosencrantz for driving while intoxicated. The officer later testified that he observed a rifle on the seat next to Rosencrantz and asked him about it. Rosencrantz replied, "[Y]ou know what I am doing with the rifle; I am sure my girl friend has talked to you about it." On cross-examination by defense counsel, the officer further testified that Rosencrantz's blood alcohol content was found to be .22%. The officer's testimony occurred during the state's rebuttal, after Rosencrantz had testified that he could not recall the shootings nor could he remember the incident when he threatened to "blow down the door." Defense counsel sought unsuccessfully to exclude the officer's testimony, arguing

that it would have been more appropriate to the state's case in chief than to rebuttal. He also characterized the testimony as inadmissible evidence of a prior crime—carrying a firearm while intoxicated, in violation of I.C. § 18–3302.

■ The mere fact that testimony might well have been presented during the state's case in chief does not, by itself, make it inadmissible for rebuttal. *State v. Olsen,* 103 Idaho 278, 647 P.2d 734 (1982). A trial judge may define the permissible scope of rebuttal testimony. We will not intervene on appeal unless an abuse of discretion is shown. *J.E.T. Development v. Dorsey Construction Co.,* 102 Idaho 863, 642 P.2d 954 (Ct.App.1982). Here, the judge noted that the officer's testimony showed that Rosencrantz, though intoxicated during the traffic stop, remembered that he had made a gun-related threat against Cathy. The testimony tended specifically to refute Rosencrantz's assertion that he could not remember the threat and it tended generally to impeach his credibility in claiming that he was unable to recall events occurring while he was intoxicated. We find no abuse of discretion in allowing the officer's rebuttal testimony.

■ Neither do we believe the testimony should have been excluded simply because it suggested a violation of I.C. § 18–3302. Although prior offenses or bad acts are inadmissible to show an accused's criminal propensity, they are admissible if relevant to material issues concerning the crimes charged. *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Matthews,* 108 Idaho 482, 700 P.2d 104 (Ct.App. 1985). Here, Rosencrantz's credibility and his mental processes when intoxicated were material issues in the first degree murder prosecution. As noted in *Matthews* and elsewhere in this opinion, the evidence, even if otherwise admissible, could have been excluded if unfair prejudice had outweighed its probative value. However, no showing of unfair prejudice has been presented. We hold that the officer's testimony was properly admitted.

## C

We now turn to testimony by another police officer, who interviewed Rosencrantz in the hospital after the shootings. The interview was tape recorded. The officer testified that during the interview Rosencrantz said, "I think I shot myself." The tape recording itself was not placed in evidence but was made available to the defense.

■ Rosencrantz argues that the tape recording was the "best evidence" of the interview and that it alone was admissible. We think this argument misperceives the purpose of the "best evidence" rule. The rule, codified at I.C. § 9–411 and essentially reproduced at I.R.E. 1002, "states a preference in favor of original written instruments—as opposed to copies, testimony, or other secondary sources of information—*to prove the terms of a writing.*" *State v. Williams*, 103 Idaho 635, 645, 651 P.2d 569, 579 (Ct.App.1982) (emphasis added), *overruled on other grounds, State v. Pierce*, 107 Idaho 96, 685 P.2d 837 (Ct.App.1984). The rule is not applicable if the writing is collateral to testimony about an extrinsic event. E. CLEARY, McCORMICK ON EVIDENCE § 234, p. 709 (3d ed. 1984). As noted by the introductory comment to I.R.E. 1001, the "best evidence" rule never has required "that an event be proved only by a writing merely because a written record of the event exists...."

■ Of course, the present case involves a tape recording, not a written instrument. However, even if we assume, for the sake of discussion, that the tape is a form of "writing," it still is merely a collateral record of the interview at the hospital. Rosencrantz's statement during the interview had evidentiary significance regardless of whether it was recorded. The officer who testified about the interview said that he independently recalled it and that he used the tape recording only to refresh his memory. We conclude that the "best evidence" rule did not bar admission of the officer's testimony.

## D

We next consider the trial court's refusal to allow testimony about an interview conducted with Rosencrantz while he was under the influence of sodium amytal. This substance, popularly known as "truth serum," supposedly prevents a subject from withholding the truth. Rosencrantz, having been injected with the drug, was questioned by a doctor about the shootings. He responded that he did not recall killing anyone and that there may have been some other person at Cathy's house who fired the fatal shots.

The admissibility of "truth serum" tests was addressed by our Supreme Court in *State v. Linn*, 93 Idaho 430, 462 P.2d 729 (1969). There the Court held that until such tests gained scientific acceptability, they would be inadmissible. The record in this case contains no such showing.

■ Rosencrantz cites *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984), for the proposition that hypnotically refreshed testimony may be admitted in some circumstances. He argues that statements made under the influence of sodium amytal should be treated similarly. However, we have not been furnished any scientific basis to conclude that hypnosis and the use of sodium amytal produce comparable results. The analogy is dubious, and speculative at best. It is hardly the kind of foundation our Supreme Court demanded in *Linn*. Absent such a foundation, we hold that the district judge did not err in refusing to admit testimony about the sodium amytal interview in this case.

## E

■ The last evidentiary issue is whether a written report summarizing an expert's testimony should have been excluded, either as hearsay or as unduly cumulative evidence. The report described a neutron activation test performed on Rosencrantz after his arrest. The test, designed to reveal residue from discharge of a firearm, was inconclusive.

The admission of cumulative evidence is within the trial court's sound discretion. *State v. Steinkraus*, 76 N.M. 617, 417 P.2d 431 (1966). Here, the report and the testimony dealt with a technical subject. We find no abuse of discretion in allowing the report as an exhibit. Neither do we find that the report was hearsay. It was simply an extension of in-court testimony by a witness available for cross-examination. The report was properly admitted.

## II

Our attention now shifts from evidentiary questions to remarks by the prosecutor during his closing argument. At several junctures the prosecutor used such phrases as "I think" or "I believe." Rosencrantz has argued that these phrases represent an improper expression of the prosecutor's personal opinion about the case.

■■■■ It is true, of course, that due process requires a prosecutor to refrain from stating his personal view concerning guilt or the credibility of a witness. *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979). But this rule is tempered by the general policy that counsel for both sides have "the right to discuss fully, from their respective standpoints, the evidence and the inferences and deductions arising therefrom." *State v. Sistrunk*, 98 Idaho 629, 630, 570 P.2d 866, 867 (1977). We have examined the transcript closely in this case. The occasional phrases "I think" or "I believe" appear in contexts where evidence is being recited or inferences are being urged. They do not manifest any attempt by the prosecutor to use his official position or his personal knowledge of the case as a means of inducing the jury to vote for conviction. Accordingly, while we discourage the use of such phrases during argument, we find in this case that they did not impermissibly infringe upon Rosencrantz's right to a fair trial.

## III

■■■■ Finally, we consider the assertion that consecutive, fixed sentences of ten years are excessive punishment for the homicides committed in this case. Each sentence represents the maximum penalty available under the voluntary manslaughter statute in existence when the killings occurred.[3] A sentence within statutory limits will not be disturbed on appeal unless it is affirmatively shown to be unreasonable upon the facts. *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982). The concept of reasonableness is further developed in *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982):

> [A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable. Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria.

■■■■ When evaluating the reasonableness of a sentence, we undertake an independent examination of the record, focusing upon the nature of the offense and upon the character of the offender. *State v. Reinke*, 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982). The circumstances surrounding these homicides have been noted, in part, by our discussion of other issues. Rosencrantz and Cathy Gittel lived together until Cathy moved to her sister's home. Rosencrantz became jealous of Cathy's social contacts with other men. While intoxicated, he threatened her and on one occa-

---

**3.** The statute, I.C. § 18–4007, later was amended by increasing the maximum term of imprison-

ment from ten years to fifteen years for each offense.

sion he beat her. During the last day of Cathy's life, Rosencrantz went to the sister's house for a visit, but Cathy refused to see him. She had a male guest in the home. Rosencrantz departed, went to a tavern, became intoxicated and returned to the house. There, as the jury found, he used a shotgun to kill Cathy and her friend, Michael Lee.

■ Rosencrantz had no prior record of convictions for violent crimes. His record consisted of ten offenses, most alcohol or drug related, which the district judge described as "rather minor." Born in 1952, Rosencrantz had worked on farms and as a long-haul trucker. He had been married and divorced. Two minor children were in his former wife's custody. Numerous acquaintances described Rosencrantz as amiable and law-abiding, except when he was intoxicated.

The district judge prepared an exceptionally comprehensive and thoughtful sentencing memorandum. Noting Rosencrantz's propensity for violence when intoxicated, the judge expressed concern for the safety of society. He also adverted to the necessity of deterrence and to the appropriateness of retribution for these appalling homicides. The judge quoted excerpts from earlier decisions of this Court in homicide cases:

> [T]he public interest demands that our criminal justice system convey a clear message, through the sentencing process, that the use of deadly force in domestic strife—or in other emotional conflicts—is condemned by society and will be firmly punished.

*State v. Pettit*, 104 Idaho 601, 603, 661 P.2d 767, 769 (Ct.App.1983).

> An intentional killing takes from the victim what an offender can never restore— the fragile gift of life. It is the final betrayal of another human being and the ultimate affront to civility. Our courts have no deeper obligation than to express society's condemnation of this act.

*State v. Miller*, 105 Idaho 838, 841, 673 P.2d 438, 441 (Ct.App.1983). We agree with the judge that these excerpts fit the instant case.

When reviewing fixed sentences, we deem the duration of confinement to be the term of the sentence "less the formula reduction available as a matter of right for good conduct under I.C. § 20–101A." *State v. Miller*, 105 Idaho at 840, 673 P.2d at 440. Section 20–101A prescribes several forms of sentence reduction, but only one of them is available as a matter of right for good conduct. That is the reduction computed on a sliding scale according to the term of the sentence. Where, as here, the term is ten years or more, the inmate can receive a reduction of ten days per month served, or approximately one-third of the sentence. Thus, the consecutive sentences in this case are deemed, for the purpose of appellate review, to require confinement for an aggregate period of at least thirteen and one-third years. In light of the foregoing discussion, we cannot say that such confinement would be unreasonable upon the facts of this case.

■ Counsel for Rosencrantz has urged on appeal, and we acknowledge, that the district judge in his sentencing memorandum referred not only to "good time" available as a matter of right but also to additional, discretionary "good time" available under I.C. § 20–101A for "inmates doing an outstanding job." In *Miller* we, too, noted this type of "good time." However, we did not consider it in determining the length of confinement for appellate review because it is not available as a matter of right for good conduct. Indeed, it appears that this additional sentence reduction is granted to no more than one percent of the inmate population. *See* Department of Corrections Policy and Procedure Manual, Part IV, § 609. We think it would be inappropriate for a judge to determine the length of a fixed sentence upon the assumption that it will be reduced by this type of "good time" reduction.

■ Nevertheless, we are unpersuaded that the instant sentences should be set aside. The district judge referred to additional "good time" only as a "possibility."

He stated no assumption that it would, in fact, be granted. We decline to speculate on appeal that the judge indulged in an unstated assumption. Error will not be presumed. If clarification of the judge's intent is desired, it is available under I.C.R. 35 after our remittitur on appeal has been issued.

Rosencrantz also urges us to examine the "proportionality" of the sentences in this case, comparing them with sentences in other cases. We have not been furnished a sufficient record to perform this task. Counsel simply has invited our attention to various appellate decisions in which seemingly less severe sentences for more serious crimes were affirmed. However, such cases provide no foundation to determine proportionality. As we noted in *Miller*, "our affirmance of sentences in other cases does not necessarily signify that we considered those sentences adequate in the cases where they were imposed. We were not asked to review those sentences for adequacy; we were asked to review them for excessiveness. We held that they were not excessive." 105 Idaho at 841, 673 P.2d 441.

The judgment of conviction is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.